# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CT-00589-SCT

*CREDIT LYONNAIS NEW YORK BRANCH*
*v.*
*ALFRED RANDOLPH KOVAL*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 4/4/97 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL LOUIS FONDREN |
| ATTORNEY FOR APPELLEE: | FLOYD J. LOGAN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED - 8/5/1999 |
| MOTION FOR REHEARING FILED: | 08/16/99; denied 09/23/99 |
| MANDATE ISSUED: | 09/30/99 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This matter which is before us on a writ of certiorari presents an application of the "discharge for value" or "innocent third party creditor" doctrine with respect to restitution under Article 4A of the Uniform Commercial Code. The Court of Appeals reversed a judgment based on a circuit court judgment which affirmed a county court jury verdict in favor of a creditor who received a duplicate wire of funds. We granted this certiorari because this case presents an application of a rarely used doctrine in our state.

**I.**

¶2. Alfred Randolph Koval , a Mississippi citizen, had $86,986.46 on deposit with a Luxemburg branch of Bank of Credit and Commerce International ("BCCI") when BCCI was liquidated.

¶3. The BCCI liquidator notified Koval that Association pour la Guarantie des Depots, Luxemburg's deposit protection scheme ("DPS"), would forward $14,450.45 to his bank account, the maximum amount payable by DPS. DPS is Luxemburg's equivalent to the FDIC.

¶4. DPS ordered the bank holding its deposits, Banque et Caisee d'Epargne de L'Etat ("Banque"), to wire $14,403.54 ($14,450.45 less wire charges) to Koval. Banque instructed Credit Lyonnais, its correspondent bank in the U.S., to wire the funds. On July 12, 1993, Credit Lyonnais wired $14,403.54 to Hancock Bank to the account of Koval. The next day, Credit Lyonnais mistakenly repeated the wire.

¶5. Realizing its mistake, some months later, Credit Lyonnais asked Koval return the second $14,403.54 mistakenly wired to him. Koval refused, arguing that since he had a claim against BCCI, he would keep the money.

¶6. BCCI did not have an account with Credit Lyonnais. The funds in the second wire belonged to Credit Lyonnais, not to BCCI, its liquidator or DPS.

## II.

¶7. Credit Lyonnais sued Koval in the County Court of Harrison County to recover the funds sent by the duplicate wire ($14,403.54), claiming that it erroneously wired the funds to Hancock Bank for the account of Koval. The jury returned a verdict for Koval, and judgment in Koval's favor was entered.

¶8. Credit Lyonnais appealed to the Circuit Court of Harrison County which affirmed the county court. Credit Lyonnais then appealed to this Court, and the appeal was assigned to the Court of Appeals. The Court of Appeals reversed and rendered judgment in favor of Credit Lyonnais. The Court of Appeals found that Koval was owed the money mistakenly paid to him, that Koval was told by the BCCI liquidator that he would get one payment of $14,500 less wire charges, and that when Koval got two wires, he should have been on notice that the second wire was not intended for him -- that it was a mistake.

¶9. Koval filed a petition for writ of certiorari claiming that the Court of Appeals' decision was contrary to Article 4A, specifically § 75-4A-205. Koval claims that under the "discharge for value" rule of restitution of Article 4A, he can keep the funds from the duplicate wire transfer because he was owed money by BCCI and did not know that the second wire was a mistake.

# III.

¶10. This is a case to recover funds sent in error by a duplicate wire transfer. Article 4A of the UCC, Miss. Code Ann.§ § 75-4A-101 et seq. (Supp. 1998), governs funds transfers.

¶11. The specific issue in this appeal is how does Article 4A adjust the equities when funds are mistakenly wired twice. Article 4A contains a specific provision applicable to this situation-*to-wit:* § 75-4A-205. The pertinent portion of § 75-4A-205 provides:

> If the funds transfer [wire transfer] is ... [an] erroneous payment order ... [such as a duplicate wire transfer], the sender is not obliged to pay the order and the receiving bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.

Miss. Code Ann. § 75-4A-205(a)(2) (Supp. 1998).[1]

¶12. Section 75-4A-205(a)(2) instructs that Credit Lyonnais can sue Koval to recover the funds sent by the duplicate wire transfer under the legal theories of mistake and restitution.

¶13. Koval admits that recovery, if any, against him lies under restitution but asserts that the "discharge of value" rule of restitution, not the common law "mistake of fact" rule of restitution, governs this case.

¶14. While we have not yet addressed the issue of restitution in relation to Article 4A, we have adopted the "discharge for value" or "innocent third-party creditor" rule of restitution as set forth in the Restatement, Restitution Sec. 14.[2] *Omnibank v. United S. Bank*, 607 So. 2d 76, 92 (Miss. 1992); *see also Industrial Indem. Co. v. Truax Truck Line, Inc.*, 45 F.3d 986 (5th Cir. 1995)(applying Mississippi law, citing *Omnibank*, and applying discharge for value); *National Benefit Adm'rs, Inc. v. Mississippi Methodist Hosp. & Rehabilitation Ctr., Inc*., 748 F. Supp. 459 (S. D. Miss. 1990) (concluding that Mississippi law of restitution is based upon unjust enrichment and reasoning, in concert with the Restatement and other jurisdictions applying it, that an innocent third-party creditor is not unjustly enriched).

¶15. This discharge for value rule is particularly appropriate for wire transfers for the reasons stated in the analysis of the New York Court of Appeals in *Banque Worms v. BankAmerica Int'l,* 928 F.2d 538 (2d Cir. 1991), *on certified question*, 570 N.E.2d 189 (N.Y. 1991). The discharge for value rule of restitution is an appropriate defense to cases seeking recovery of funds mistakenly wired for two reasons. First, it achieves the degree of finality, or phrased another way certainty, sought to be achieved by the drafters of Article 4A. Second, national uniformity was another goal of the drafters of

Article 4A, and our holding places Mississippi in accord with the majority of the few other appellate courts which have addressed this question although some of those other cases addressed pre-Article 4A scenarios in view of the goals and objectives of Article 4A.

¶16. ***Banque Worms v. BankAmerica Int'l****,* 928 F.2d 538 (2d Cir. 1991), *on certified question*, 570 N.E.2d 189 (N.Y. 1991), is the preeminent case on erroneous wire transfers and is a well-reasoned decision meriting mention by us. In the ***Banque Worms*** case, Spedley Securities, Ltd., instructed Security Pacific International Bank to wire approximately $2 million to Banque Worms at BankAmerica. Banque Worms was a creditor of Spedley Securities. Just hours later, Spedley Securities told Security Pacific to disregard the first wire instructions and to wire the $2 million to another creditor, National Westminster Bank. Later that day, Security Pacific wired $2 million to Banque Worms at BankAmerica but within hours notified BankAmerica the wire was a mistake. 928 F.2d at 539. Security Pacific then wired the $2 million to National Westminster as the replacement instructions directed. Pursuant to an indemnity from Security Pacific, BankAmerica returned the funds to Security Pacific. Banque Worms, however, refused to agree to BankAmerica's return of the funds to Security Pacific. BankAmerica asked Security Pacific to return the funds pursuant to the indemnity agreement. Security Pacific attempted to get funds from Spedley Securities to cover the indemnity, but, by that time, Spedley Securities had entered into involuntary liquidation. ***Id.*** at 540.

¶17. Banque Worms sued BankAmerica in federal district court in New York to recover the funds. BankAmerica filed a third-party complaint against Security Pacific. Security Pacific filed a counterclaim against Banque Worms and BankAmerica seeking a judgment that Security Pacific was entitled to the funds regardless of which bank was in possession of the funds at the time of judgment. Later, Security Pacific returned the funds to BankAmerica which credited the funds to Banque Worms's account. BankAmerica was dismissed from the suit, leaving Banque Worms and Security Pacific to fight over the funds. ***Id.***

¶18. Security Pacific claimed that it mistakenly wired the funds and was entitled to the funds under the mistake of fact rule of restitution embodied in New York common law via New York caselaw. Banque Worms asserted it was entitled to keep the funds under the discharge for value rule of restitution adopted by the Restatement of Restitution. The federal district court said that if the mistake of fact rule of restitution governed the case, Security Pacific was entitled to the funds mistakenly paid unless Banque Worms, relying on the payment, changed its legal position to such an extend that requiring a refund would be unjust. The federal court stated that if, however, the discharge for value rule of restitution applied to the case, Banque Worms could kept the funds even though mistakenly paid since it received the funds from Security Pacific in discharge

of the debt owed by Spedley Securities to Banque Worms but only if Banque Worms made no misrepresentation and had no notice of Security Pacific's mistake. The federal district court found that the mistake of fact rule of restitution was part of New York caselaw. The federal district court, however, ruled in Banque Worms's favor, finding that although New York had not adopted the Restatement of Restitution, the section of the Restatement setting forth the discharge for value rule of restitution was based upon a New York case. *Id.* Security Pacific appealed to the United States Court of Appeals for the Second Circuit which certified the issue to the New York Court of Appeals. *Id*. at 541.

¶19. Although the wire transfer involved in the ***Banque Worms*** case occurred prior to the adoption of Article 4A, the New York Court of Appeals heavily relied on Article 4A's purposes and goals in deciding which rule of restitution applied to the wire transfer - *i.e.,* the common law "mistake of fact" rule of restitution or the "discharge for value" rule of restitution adopted by the Restatement of Restitution. The ***Banque Worms*** court held that the "discharge for value" rule applied to the electronic funds transfer involved in the suit since it was consistent with and achieved the policy goal of finality sought by the drafters of Article 4A. As the New York Court of Appeals explained its rationale behind its holding,

> Although no provision of article 4-A calls, in express terms, for the application of the "discharge for value" rule, the statutory scheme and the language of various pertinent sections, as amplified by the Official Comments to the UCC, support our conclusion that the "discharge for value" rule should be applied in the circumstances here presented.

570 N.E.2d at 196.

¶20. As the ***Banque Worms*** court explained:

> When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation.

*Id*.

¶21. Under the discharge for value rule of restitution, when a beneficiary receives money to which he is entitled and has no knowledge that the money was erroneously wired, the beneficiary can treat the wire as final and not repay funds erroneously wired. There, however, are two conditions precedent to the application of the discharge for value rule of restitution. First, the beneficiary receiving the funds transfer must be

entitled to receive money in payment of a debt. It is not necessary, however, that the originator be the beneficiary's debtor. Section 75-4A-205 provides that the recovery of an erroneous payment may be had as provided by the rules for mistake and restitution (*i.e.* the discharge for value rule). Discharge for value requires that a benefit, such as a payment, be bestowed (1) on the creditor; (2) by a third person; (3) in discharge of the debt owed. For example, in *General Elec. Capital Corp. v. Central Bank*, 49 F.3d 280 (7th Cir. 1995), the originator was a customer of the debtor, whose attempted payment to the debtor was mistakenly deposited to the debtor's creditor's account. Despite the fact that the originator (*i.e.* the debtor's customer), was not indebted to the creditor/beneficiary, the Seventh Circuit in *General Elec. Capital Corp.* held that under the discharge for value rule, the bank was not entitled to obtain restitution from the creditor.

¶22. The discharge for value rule, or the innocent-third-party-creditor rule, has also been applied in an analogous situation. Numerous courts have held that an insurer is not entitled to recover payments erroneously made to an insured's health care provider. *See National Benefit Adm'rs, Inc. v. Mississippi Methodist Hosp. & Rehabilitation Ctr., Inc.*, 748 F. Supp. 459, 464-65 (S.D. Miss. 1990). *See also Time Ins. Co. v. Fulton-DeKalb Hosp. Auth.*, 438 S.E.2d 149, 152 (Ga. Ct. App. 1993); *St. Mary's Med. Ctr., Inc. v. United Farm Bureau Family Life Ins. Co.*, 624 N.E.2d 939 (Ind. Ct. App. 1993); *Lincoln Nat. Life Ins. Co. v. Brown Schs., Inc.*, 757 S.W.2d 411 (Tex. Ct. App. 1988). Similarly, DPS, as the insurer, via Credit Lyonnais, made a payment to discharge a debt owed by BCCI; and Koval should not be required to refund the payment unless he had notice of the mistake.

¶23. Second, the beneficiary must not have any knowledge that the funds were erroneously wired. If either of these two conditions is lacking, the discharge for value rule does not apply.

## IV.

¶24. It is precisely this rule which was applied in the county court. The jury was properly instructed and rendered a verdict for Koval. Our only task is to determine whether the state of the evidence was such that we can say as a matter of law that Koval had "notice of the mistake."

¶25. The discharge for value rule "is specific application of the underlying principle of bona fide purchase." Comment, Restatement, Restitution Sec. 14. It is appropriate then that we look to our precedents regarding bona fide purchasers on the issue of notice. Our statutory and case law indicates that a purchaser is charged with actual notice of facts of which he has actual knowledge; and, where the purchaser has knowledge of facts which would cause a reasonable person to inquire, he is charged

with inquiry notice of those facts which could be uncovered by diligent investigation. Miss. Code Ann. § 75-1-201(25) (1972) defines notice as follows:

A person has "notice" of a fact when

(a) He has actual knowledge of it; or

(b) He has received a notice or notification of it; or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this code.

¶26. This Court has held that a purchaser of land is on notice as to facts which would be disclosed upon diligent investigation, if there is "any recital sufficient to put a reasonably prudent man on inquiry as to the sufficiency of the title." *Simmons v. Mississippi Transp. Comm'n*, 717 So. 2d 300, 303 (Miss. 1998) (quoting *Bedford v. Kravis*, 622 So. 2d 291, 295 (Miss. 1993) (quoting *Florida Gas Exploration Co. v. Searcy*, 385 So. 2d 1293, 1296 (Miss. 1980) (quoting *Dead River Fishing & Hunting Club v. Stovall*, 147 Miss. 385, 395-96, 113 So. 336, 337-38 (1927). *See also Mills v. Damson Oil Corp.*, 686 F.2d 1096, 1101-02 (5th Cir. 1982) (citing *Baldwin v. Anderson*, 103 Miss. 462, 60 So. 578 (1913); *Bowen v. Thornton*, 227 Miss. 562, 86 So. 2d 505 (1956) (holding that, under Mississippi law, a purchaser is a bona fide purchaser for value without notice, unless there is actual notice or circumstances which would put a purchaser on inquiry notice); *Johnson v. Carter*, 193 Miss. 781, 11 So. 2d 196 (1943).

¶27. In *Board of Educ. v. Hudson*, 585 So. 2d 683, 687 (Miss. 1991), it was held that a lessee of sixteenth section land was not a bona fide purchaser for value without notice where the lease price, paid by his predecessor in interest, was unconscionably inadequate. "[W]hatever is enough to excite attention or put a party on inquiry, is notice of everything to which such attention or inquiry might reasonably lead." *Id.* (quoting *Baldwin v. Anderson*, 103 Miss. 462, 60 So. 578 (1913). This Court has further stated that:

... the rule is that "when, in respect to a matter in which [one] has a material interest, a person has knowledge of such facts as to excite the attention of a

reasonably prudent man and to put him upon guard and thus to incite him to inquiry, he is chargeable with notice, equivalent in law to knowledge, of all those further relevant facts which such inquiry, if pursued with reasonable diligence, would have disclosed.". . .

*Crawford v. Brown*, 215 Miss. 489, 503, 61 So. 2d 344, 350 (1952) (quoting *First Nat'l Banks v. Johnson*, 177 Miss. 634, 643, 181 So. 11, 14 (1936)). Also, under the restitution theory of money had and received, this Court held that a creditor was not entitled to retain a payment mistakenly made, even though the debtor owed the creditor a valid debt, where the check indicated that it was intended as payment to another, thereby putting the creditor on notice of the mistake. *Milliken & Michaels, Inc. v. Fred Netterville Lumber Co.*, 676 So. 2d 266, 269 (Miss. 1996).

¶28. Here, the record supports the jury's finding that Koval made no misrepresentations which induced the duplicate payment and that Koval did not have notice of Credit Lyonnais's mistake. The fact that Koval knew that DPS was to pay him around $13,000 as an insurer of his deposit, is not necessarily determinative, where a jury could reasonably find that such knowledge did not amount to notice of Credit Lyonnais's mistake. And the record facts reasonably support just such a finding.

¶29. Koval testified that it was his understanding that he would receive money from DPS and from the BCCI liquidators. He knew approximately how much DPS would be paying; but, he did not know how much he would get from the liquidators. Prior to being informed by Credit Lyonnais of the erroneous deposit, Koval discovered that he had additional funds in his account. Upon his discovery, Koval testified that he was not aware of the source of the funds, but assumed that it was associated with BCCI. Koval also stated that the only way to determine who deposited the funds was to speak to a someone in customer service, which he did not do. Also, Koval's bank statement does not show the originator of the two deposits; the statement merely designates them as deposits. It appears that the funds were wired directly into Koval's account. Koval did not know the funds were there until sometime later. It was not until some months later, according to his testimony, that Credit Lyonnais asserted an error had been made. Under the circumstances the jury cannot be faulted for concluding that Koval did not have notice of the mistake.

## CONCLUSION

¶30. We reverse the judgment of the Court of Appeals and reinstate the circuit court judgment.

¶31. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE CIRCUIT COURT IS REINSTATED**.

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., AND McRAE, J., CONCUR. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MILLS, WALLER AND COBB, JJ.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶32. I agree with the majority and have no doubt that the discharge for value rule of restitution analysis applies in this case. Maj. Op. at 9. However, the determinative fact in this case is that Koval knew that Credit Lyonnais erroneously wired the funds to him is the crucial determination to be made in this case. Because the facts support a holding that Koval was aware of Credit Lyonnais's error in wiring him the funds twice, I respectfully dissent to the majority's holding that Koval did not have such knowledge. Maj. Op. at 12.

¶33. Article 4A of the UCC, Miss. Code Ann. § § 75-4A-101 *et seq. (Supp 1998)*, governs wire transfers. The issue in this appeal is how does Article 4A adjust the equities when funds are mistakenly wired twice. Article 4A contains a specific provision applicable to this situation - *to-wit:* § 75-4A-205.

¶34. The pertinent portion of § 75-4A-205 provides

> If the funds transfer [wire transfer] is ... [an] erroneous payment order ... [such as a duplicate wire transfer], the sender is not obliged to pay the order and the receiving bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.

Miss. Code Ann. § 75-4A-205(a)(2) (Supp. 1998).[3]

¶35. Section 75-4A-205(a)(2) instructs that Credit Lyonnais can sue Koval to recover the funds sent by the duplicate wire transfer under the legal theories of mistake and restitution. Under the discharge for value rule of restitution, when a beneficiary receives money to which he is entitled and has no knowledge that the money was erroneously wired, the beneficiary can treat the wire as final and not repay funds erroneously wired. There, however, are two conditions precedent to the application of the discharge for value rule of restitution. First, the beneficiary receiving the funds transfer must be entitled to receive the money from the originator of the wire. Second, the beneficiary must not have any knowledge that the funds were erroneously wired. If either of these two conditions is lacking, the discharge for value rule does not apply. *See Banque*

*Worms v. BankAmerica Int'l,* 928 F.2d 538 (2d Cir. 1991), *on certified question*, 570 N.E.2d 189 (N.Y. 1991) (the preeminent case on erroneous wire transfers).

¶36. The discharge for value rule of restitution does not apply to Koval's case for two reasons. First, Koval was not entitled to receive from the originator (DPS) the funds in the erroneous, duplicate wire transfer. BCCI owed Koval $86,986.46, the amount of money which Koval had on deposit at BCCI at the time BCCI was liquidated. DPS only owed Koval $14,403.54, which was the amount of money to which Koval was entitled under the Luxemburg deposit protection program. Even Koval admitted that DPS only owed him $14,403.54. The $14,403.54 debt owed by DPS to Koval was satisfied by the first wire transfer. The sender/originator of the second wire transfer was DPS, not BCCI, and the funds in the second wire transfer belonged to Credit Lyonnais, not to BCCI; thus, Koval was not entitled to receive from DPS the funds transmitted by the second wire transfer.

¶37. Second and most importantly, Koval knew or should have known the second wire transfer was a mistake. Koval testified at trial that he was told that DPS would send him **one** payment of $14,500 less wire charges but that he received one payment of $14,500 less wire charges on one day and a second payment of $14,500 less wire charges on the next day. Koval claimed at trial that he did not know who wired the funds. The advice on the second wire transfer clearly shows that the funds were wired at the direction of DPS. Without question, Koval was on notice that the second wire was not intended for him since the debt owed by DPS to Koval had been paid in full by the first wire transfer. Koval cannot claim that he had no knowledge that the second wire was a mistake.

¶38. However, the facts of Koval's case does not fit the discharge for value rule of restitution, and, accordingly, the discharge for value rule of restitution was not a defense available to Koval. Credit Lyonnais sued Koval to collect $14,403.45 mistakenly paid. The discharge for value rule of restitution was not a defense available to Koval.[4] The money sent by the second wire belongs to Credit Lyonnais. Credit Lyonnais did not owe Koval any money. Koval did not have any right to kept money belonging to Credit Lyonnais.

¶39. Therefore, the Court of Appeals properly found that Credit Lyonnais was entitled to recover the funds erroneously wired to Koval by the duplicate wire transfer. We should affirm the Court of Appeals' judgment.

¶40. Accordingly, I respectfully dissent.


 **MILLS, WALLER AND COBB, JJ., JOIN THIS OPINION.**

1. The sender is the person giving the instruction to the receiving bank. The receiving bank is the bank to which the sender's instruction is given. The beneficiary is the person to whose account the funds are being wired. Miss Code Ann. § 75-4A-103(Supp. 1998). DPS is the sender. Credit Lyonnais is the receiving bank. Koval is the beneficiary.

2. Restatement, Restitution § 14, the discharge for value rule, provides in pertinent part:

> (1) A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.
>
> * * * *

3. The sender is the person giving the instruction to the receiving bank. The receiving bank is the bank to which the sender's instruction is given. Beneficiary is the person to whose account the funds are being wired. Miss. Code Ann. § 75-4A-103 (Supp. 1998) . DPS is the sender. Credit Lyonnais is the receiving bank. Koval is the beneficiary.

4. Koval raised other defenses to Credit Lyonnais's suit to collect $14,403.54. The facts did not support any of the defenses asserted by Koval.